No. 16-36034

In The

# United States Court of Appeals
## for the Ninth Circuit

**P. Bret Chiafalo, *et al.*,**

*Appellants*,

v.

**Jay Inslee, in his official capacity as Governor of Washington, *et al.*,**

*Appellees*,

**President-elect Donald J. Trump; Donald J. Trump for President, Inc.; and Washington State Republican Party**

*Intervenors*.

**Intervenors' Opposition to Appellants' Emergency Motion Under Circuit Rule 27-3 For An Order Declaring Revised Code of Washington 29A.56.340 Unconstitutional**

Harry Korrell , III
Robert Maguire
DAVIS WRIGHT TREMAINE
1201 Third Ave. Ste 2200
Seattle, WA 98101
Tel: (206) 622-3150
Fax: (206) 757-7700
robmaguire@dwt.com
*Counsel for Washington*
*State Republican Party*

Andrew Bentz
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
Tel: (202) 879-3849
Fax: (202) 626-1700
abentz@jonesday.com
*Counsel for President-elect*
*Donald J. Trump; Donald J.*
*Trump for President, Inc.*

*Additional Counsel Listed on Inside Cover*

Robert A. McGuire, III
THE ROBERT MCGUIRE LAW
    FIRM
2703 Jahn Ave. N.W.
Ste C-7
Gig Harbor, WA 98335
Tel: (253) 313-5485
*Counsel for President-elect
Donald J. Trump; Donald
J. Trump for President, Inc.*

Chad A. Readler
*Admission application pending*
JONES DAY
325 John H. McConnell Blvd.
Suite 600
Columbus, OH 43215
Tel:(614) 281-3891
careadler@jonesday.com
*Counsel for President-elect
Donald J. Trump; Donald J.
Trump for President, Inc.*

Three months ago, Appellants signed an oath "affirming that they would cast their ballots on December 19, 2016 for the Democratic Presidential and Vice-Presidential candidates." Compl. ¶ 3.3. Now, just days before Appellants were to honor that oath, they seek the Court's permission to back out of their commitment to their party (which relied on their promise when nominating them) and to millions of Washington voters (who relied on their promise when casting their ballots).

Every court to confront such a claim this election cycle has rejected it—a federal court in Colorado, a state court in Colorado, and a federal court in Washington (the court below). This Court should do likewise. Most importantly, the relief Appellants seek—an "order declaring [Washington's statute] unconstitutional"—is legally unavailable, because there is no such thing as a preliminary declaratory judgment or a declaratory judgment pending appeal.

In addition to this threshold flaw, Appellants' motion fails many times over. For one, they cannot justify the issuance of an order just days before the meeting of the Electoral College. For another, numerous procedural and jurisdictional problems doom Appellants' lawsuit. And in all events, even if Appellants cleared these hurdles—and even if they had requested an injunction pending appeal—Appellants cannot satisfy the prerequisites for injunctive relief.

Our democracy embraces the orderly transition of power. President Obama thus instructed his team to "work as hard as [they] can to make sure that this is a

successful transition," following "the example that President Bush's team set."[1] Appellants' last-minute effort to disrupt that transition should come to an end.

## I.    APPELLANTS SEEK A NONEXISTENT REMEDY

To obtain an appellate court's immediate intervention following the district court's denial of preliminary relief, the losing party must seek an injunction pending appeal. *SEAC v. U.S. Army Corps of Engineers*, 472 F.3d 1097, 1100 (9th Cir. 2006). Appellants, however, did not move for an injunction, and indeed did not even use the word "injunction" in the body of their argument. Instead, they have moved for an emergency declaratory order—specifically, an "order … declaring that Revised Code of Washington 29.A.56.340 is unconstitutional." Mot. Cover; *accord* Mot. 4 ("order … declaring"); Mot. 13 ("Order Declaring"); Mot. 15 ("order … declaring"); *compare Baca v. Hickenlooper*, No. 16-1482, Dkt. 4 (10th Cir. 2016) (moving for "injunction pending appeal").

Federal law does not recognize the remedy Appellants seek. "[P]rior to final judgment there is no established declaratory remedy comparable to a preliminary injunction." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975); *see Siegel v. Salisbury*, 379 F. Supp. 317, 324 (W.D. Pa. 1974) ("no such thing as a preliminary declaratory judgment"). Appellants' decision to seek a remedy that does not exist resolves this appeal at the outset.

---

[1] David Nakamura, *Trump Meets with Obama*, Washington Post (Nov. 10, 2016).

## II.    THE *PURCELL* PRINCIPLE PRECLUDES THIS COURT FROM IN-TERVENING DAYS BEFORE THE ELECTORS MEET

Even if Appellants had sought an injunction pending appeal, they would not be entitled to one, given how late they made their request.  Courts should generally refrain from issuing election-related orders in the "weeks before an election." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006); *see Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012).  Election-eve orders risk "serious disruption of [the] election process" (*Williams v. Rhodes*, 393 U.S. 23, 35 (1969)), and can cause "confusion" (*Purcell*, 549 U.S. at 5).  In recent election cycles, the Supreme Court has "stepped in … several times" to prevent "judicial alteration of the status quo." *Veasey v. Perry*, 769 F.3d 890, 894 (5th Cir. 2014); *see Ariz. Secretary of State's Office v. Feldman*, No. 16A460 (Nov. 5, 2016).

These principles apply to the impending meeting of the Electoral College, which Appellants themselves deem an "election."  Last-minute orders, followed by last-minute appeals, followed by last-minute applications to the Supreme Court, would throw the Electoral College into chaos.  It would leave electors uncertain about their obligations under state law, and it would leave state officials confused about how to administer the electoral process.

The *Purcell* principle is especially relevant to today's case.  *First* and foremost, this case concerns the election of the President of the United States—an election whose "importance," "vital character," and "effect upon the welfare and safety

- 3 -

of the whole people" "cannot be too strongly stated." *Burroughs v. United States*, 290 U.S. 534, 545 (1934). Any disruption of a presidential election would frustrate a "uniquely important national interest." *Anderson v. Celebrezze*, 460 U.S. 780, 795 (1983).

*Second*, the Electoral Count Act of 1887 requires "any controversy or contest" relating to the "selection of electors" to be "completed" no later than December 13—*six days* before the Electoral College meets. *Bush v. Gore*, 531 U.S. 98, 110 (2000) (citing 3 U.S.C. § 5). By the time this Court acts it will be December 16—*three days* before the Electoral College meets, and three days after the congressional deadline for the resolution of such disputes has passed.

*Third*, this case presents an unusually high risk of prompting "conflicting orders" and of ensuing "confusion" (*Purcell*, 549 U.S. at 4–5). Challenges to state faithless-elector laws are so far pending in (1) this Court, (2) the Tenth Circuit, (3) a federal district court in California, and (4) the Colorado Supreme Court. Conflicting rulings would leave electors and election officials across the union in doubt about how to proceed on December 19.

*Fourth*, the "imminence of the election" leaves "inadequate time to resolve" the disputed issues. *Purcell*, 549 U.S. at 5. This Court has (at most) hours to study the constitutional text, precedents, and history addressing faithless-elector laws. It would be irresponsible for any court to resolve a momentous question of constitu-

tional law with such haste.

Indeed, all of these problems result from Appellants' own tardiness. *Seven months ago*, "[o]n May 21, 2016," Plaintiffs joined the Democratic Party's electoral slate, binding themselves to vote for their party's nominees. Compl. ¶ 3.2. *Four months ago*, in July, they watched as their party formally nominated Hillary Clinton for President. *Five weeks ago*, on November 8, they saw Secretary Clinton win Washington's popular vote. Appellants' indefensible, self-created "judicial fire drill" (*Republican Party of Pa. v. Cortes*, No. 16-5524, 2016 WL 6525409, at *4 (E.D. Pa. Nov. 3, 2016)) renders judicial intervention all the more improper here. *See Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (*Purcell* presumption "especially" strong when plaintiff "unreasonably delay[s]" bringing suit).

## III.   THE COURT SHOULD NOT ENTERTAIN THIS LAWSUIT

### A.   Laches Bars Appellants' Claims

Laches bars a claim if (1) the plaintiff engages in "unreasonable delay" and (2) "prejudice" results. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001). Laches "deserves special consideration in election cases." *Duenas v. Guam Election Comm'n*, 2008 Guam 1, 4 (2008). In this fast-paced context, parties must proceed with "[e]xtreme diligence and promptness" (*State ex rel. Manos v. Delaware County Bd. of Elections*, 701 N.E. 2d, 563 (Ohio 1998)), and even a delay of "days" may be too long (*Martin v. Dicklich*, 823 N.W. 2d 336, 341 (Minn. 2012)).

Today's case presents a textbook example of unreasonable delay. Far from acting with "extreme diligence and promptness," Appellants missed opportunity after opportunity to bring this lawsuit over the course of months. *Supra* 4. Appellants' delay has gravely prejudiced millions of Washingtonians, who cast their ballots on November 8 *on the understanding that state law required electors to reflect their will.* The delay also gravely prejudices the nation as a whole, which has "proceeded with [its] affairs—business, political, and social—upon the assumption that the election is over." *Thomas v. Cohen*, 262 N.Y.S. 320, 325 (1933). Laches bars Appellants from inflicting these harms.

## B.    Appellants Lack Standing

A plaintiff has standing to bring a "preenforcement challenge to a statute" only if he can show (1) "an intention to engage in a course of conduct … proscribed by [the] statute" and (2) "a credible threat of prosecution thereunder." *SBA List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014); *see Lopez v. Candaele*, 630 F.3d 775, 785 (9th 2010). Appellants can show neither.

Appellants cannot establish an intention to engage in the proscribed conduct (voting for someone other than the candidates they represent, Hillary Clinton and Tim Kaine) because they have never "articulated concrete plans" to vote faithlessly. *San Diego Gun Rights Committee v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996). Quite the contrary, they allege only that they "*may* vote" for someone other than

Clinton and Kaine. Compl. ¶ 3.9 (emphasis added). They declare that "it *may be* that [they] need to vote for someone other than" Clinton and Kaine. Chiafalo Aff. ¶ 10; Guerra Aff. ¶ 10 (emphasis added). They in fact admit that they "may vote for" Clinton and Kaine after all. Plfs' Mem. 2. Asked about these statements in the district court, Appellants seemingly agreed that the odds they would not vote for Secretary Clinton were "between 0% and 100%." These statements defeat any suggestion that Appellants have concrete plans to vote faithlessly.

Appellants also cannot show a "credible threat of prosecution." As far as we know, Washington has never punished anyone under its faithless-elector law, and it has not indicated that it plans to pursue enforcement proceedings against Appellants. Appellants thus lack standing.

## C. This Case Presents A Political Question

A case presents a political question if there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Nixon v. United States*, 506 U.S. 224, 228 (1993). This case raises a political question because the Twelfth Amendment commits resolution of disputes about electors' votes to Congress, not to the courts. By providing that electoral votes "shall … be counted" before "the Senate and House of Representatives," the Twelfth Amendment gives *Congress* the authority to count such votes—and, thus, the authority to resolve disputes about which votes to count. Congress has enacted a statute ad-

dressing the resolution of electoral-vote disputes (3 U.S.C. § 15), and it has acted under that statute to resolve disputes relating to faithless electors (*see* 115 Cong. Rec. 9–11, 145–71, 197–246 (1969)). It is thus up to Congress, not the judiciary, to decide whether to count votes cast in violation of state faithless-elector laws.

## IV. APPELLANTS ARE NOT ENTITLED TO RELIEF

In addition to these numerous procedural flaws, Appellants' substantive claims do not justify extraordinary, emergency intervention. To obtain an injunction pending appeal (something Appellants have not asked for), a movant must show that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Appellants have not even addressed (let alone satisfied) these requirements.

### A. Appellants' Claims Will Fail On The Merits

Since a State (unlike the federal government) does not need to point to an affirmative "constitutional authorization" to act (*NFIB v. Sebelius*, 132 S. Ct. 2566, 2578 (2012) (opinion of Roberts, C.J.)), Appellants bear the burden of establishing that some constitutional provision prohibits States from enacting laws binding their electors. Appellants rely here solely on Article II and the Twelfth Amendment.

- 8 -

(In the district court they argued that binding statutes also violate electors' rights under the First and Fourteenth Amendments, but they have abandoned those arguments here.) Appellants' claim, however, has no hope of success on the merits.

### 1. Precedent establishes that States may bind electors

**a.** *Ray v. Blair*, 343 U.S. 214 (1952)—in which the Supreme Court upheld a rule requiring electors to pledge to vote for their party's nominees—controls this case. *Blair*, to be sure, involved the *making* rather than the *enforcement* of a pledge. This Court, however, is "bound by the theory or reasoning underlying a Supreme Court case, not just by its holding." *Witt v. Dept. of Air Force*, 527 F.3d 806, 818 (9th Cir. 2008). The reasoning of *Blair* confirms that States may require electors not only to make pledges but also to honor them:

- *Blair* rejected "the argument that the Twelfth Amendment demands absolute freedom for the elector to vote his own choice." 343 U.S. at 228. This Court should reject the same argument here.

- *Blair* reasoned that nothing in "the language" of the Twelfth Amendment prohibits requiring pledges. *Id.* at 225. So too, nothing in the language of the Amendment prohibits requiring the fulfillment of pledges.

- *Blair* reasoned that "[s]urely one may voluntarily assume obligations to vote for a certain candidate." *Id.* at 230. Appellants here "voluntarily assumed" their obligation to vote for their party's nominees.

- *Blair* emphasized the "longstanding practice" of appointing electors "simply to register the will of the [people] in respect of a particular candidate." *Id.* at 228–29 & n.16. Just as "longstanding practice" defeated the elector's claim in *Blair*, so too it defeats the electors' claim here.

In sum, the Supreme Court's reasons for upholding laws requiring electors to make pledges apply equally to laws requiring electors to fulfill those pledges. *See Gelineau v. Johnson*, 904 F. Supp. 742, 745 (W.D. Mich. 2012) ("[T]he opinion's reasoning strongly suggested that" "the pledge was ultimately enforceable").

**b.** Putting aside *Ray v. Blair*, the Constitution provides that each State must appoint electors "in such manner as the Legislature thereof may direct." U.S. Const. art. II, § 1, cl. 2. This constitutional power is "plenary" (*McPherson*, 146 U.S. at 25), "comprehensive" (*id.* at 27), and "exclusive" (*id.* at 36), and conveys "the broadest power of determination" (*id.* at 27).

Washington's law falls squarely within the scope of this plenary, comprehensive, and exclusive power. For one, the power to appoint includes the power to appoint subject to particular conditions. *Cf. South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (spending power includes power to attach conditions); *Schick v. Reed*, 419 U.S. 256, 261 (1974) (pardon power includes power to attach conditions). Here, Washington has simply made it a condition of becoming an elector that the elector vote for his party's nominee.

For another, Washington's law addresses the "manner" of appointing electors. Just as a state legislature may establish a system under which electors run under their own names, conduct their own campaigns, and ultimately vote their own consciences, so too it may establish a system under which electors run under the names of the presidential candidates, piggyback on the campaigns of those candidates, and ultimately vote for the candidates under whose banner they ran. The latter is just as much a "manner" of appointing electors as the former.

**c.**  More broadly, electors "are no more officers or agents of the United States than are the members of the state legislatures." *In re Green*, 134 U.S. 377, 379 (1890)).  They "act by authority of the state." *Blair*, 343 U.S. at 224.  In our federal system, the power to control "those who exercise [state] authority" is a "fundamental" element of state sovereignty. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).  A state legislature may thus require electors (state officials) to follow state law when exercising state authority to cast the State's electoral votes.

**d.**  Precedents from state courts confirm that States may bind electors.  For example, a New York court has ruled that an elector may be "required by mandamus" to fulfill his common-law duty "to carry out the mandate of the voters of his state." *Thomas*, 262 N.Y.S. at 326.  The Nebraska Supreme Court has held that elector-candidates who "openly declare that they will not perform" their "duty" to vote for their party's nominees "vacat[e] their places as … presidential electors."

*State v. Wait*, 138 N.W. 159, 163 (Neb. 1912). And the California Supreme Court has ruled that an elector's duty to "represent the preferences" of the people forms "part of [California's] unwritten law." *Spreckels v. Graham*, 228 P. 1040, 1045 (Cal. 1924). These holdings further undermine any claim that the Constitution protects the right of electors to vote as they please.

### 2. The original understanding of the Twelfth Amendment confirms that States may bind electors

The Twelfth Amendment—which "materially chang[ed] the mode of election of president" established by Article II (3 Story, *Commentaries* § 1460)—governs the Electoral College today. Whatever some of the Framers of Article II may have expected in 1789, the Framers of the Twelfth Amendment in 1804 fully understood that electors are ministerial agents who represent their parties' nominees, not platonic guardians who exercise independent judgment. "In the [very] first election held under the constitution," the people "looked beyond [the electors], fixed upon their own candidates for President and Vice President, and took pledges from the electoral candidates to obey their will." *Blair*, 343 U.S. at 228 n.15 (quoting S. Rep. No. 22, 19th Cong., 1st Sess., at 4 (1826)). From 1796 on, presidential aspirants ran as "regular party candidates," and the party's electors were "expected to support" them. *Id.* at 228 n.16. By 1802, everyone understood that "the people do not elect a person for an elector who, they know, does not intend to vote for a particular person as President." 11 Annals of Congress 1289–90 (1802).

In fact, the whole purpose of the Twelfth Amendment was to accommodate these political realities. Under the original Constitution, "the electors … did not vote separately for President and Vice-President; each elector voted for two persons, without designating which office he wanted each person to fill." *Blair*, 343 U.S. at 224 n.11. That system may have worked in a world where electors exercised independent judgment, but it broke down once electors came merely to represent their parties' nominees. For example, the election of 1800 ended in a tie because Democratic-Republican electors had no way to distinguish between presidential nominee Thomas Jefferson and vice-presidential nominee Aaron Burr when they each cast two votes for President. These problems prompted the Twelfth Amendment, which provided that electors must cast "distinct ballots" for President and Vice President. The whole point of this new procedure was to ensure that "[e]lectors could be chosen to vote for the party candidates for both offices, and electors could carry out the desires of the people, without confronting the obstacles which confounded the [election of 1800]." *Id.*; *see* 11 Annals of Congress 1289–90 (1802) (explaining that "the very thing … intended by this amendment" was to facilitate the practice of voting for electors pledged "to vote for a particular person as President") (cited in *Blair*, 343 U.S. at 224 n.11). This settled history defeats Plaintiffs' claims that Article II and the Twelfth Amendment grant electors a constitutional right to vote as they please.

### 3. Longstanding practice confirms that States may bind electors

"[L]ong settled and established practice" deserve "great weight" in constitutional interpretation. *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014); *see, e.g.*, *Blair*, 343 U.S. at 228 (emphasizing "longstanding practice"). Practice validates the law challenged here.

*The States*. At least 29 state legislatures have enacted faithless-elector laws (*see* S. Doc. No. 111-15, at 346–434 (2010)), and some state courts have concluded that electors have a common-law duty to fulfill their pledges (*supra* 13).

*Congress*. Months after ratification of the Twenty-third Amendment—which authorizes the District of Columbia to vote in presidential elections—Congress enacted a statute making it the "duty" of the District's electors to vote "in the electoral college" "for the candidates of the party [they have] been nominated to represent." 75 Stat. 819.

*The People*. From the beginning of the Republic, electors have been chosen on the understanding that they will vote for a particular presidential candidate. Justice Story thus explained (3 *Commentaries* § 1457):

> [E]lectors are now chosen wholly with reference to particular candidates … The candidates for the presidency are selected and announced in each state long before the election; and an ardent canvass is maintained in the newspapers, in party meetings, and in the state legislatures, to secure votes for the favourite candidate, and to defeat his opponents … [N]othing is left to the electors after their choice, but to register votes, which are already pledged; and an exercise of an in-

- 14 -

dependent judgment would be treated, as a political usurpation, dishonourable to the individual, and a fraud upon his constituents.

Presidential elections work much the same way today.

Appellants' theory contradicts all of this history. It would require this Court to strike down the laws of 29 States; to invalidate an Act of Congress; and to replace a two-century-old system under which the vote of the People is decisive, and the vote of the electors a formality, with a system under which the vote of the electors is decisive, and the vote of the People a formality.

### 4. Appellants' contrary arguments are unconvincing

**a.** Appellants cite only a single case in support of their claim—*United States Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995), which held that States may not impose their own qualifications for membership in Congress. Mot. 10. *Term Limits*, however, does not remotely suggest that state faithless-elector statutes violate the Constitution. *Term Limits* emphasized that senators and representatives are "federal officers" (514 U.S. at 804); electors, in contrast, "are no more officers or agents of the United States than are the members of the state legislatures" (*In re Green*, 134 U.S. at 379). *Term Limits* stressed "over 150 years" of "practice" establishing the impermissibility of state-imposed congressional qualifications (514 U.S. at 818–19); here, by contrast, two centuries of practice establish the *permissibility* of state faithless-elector laws. *Term Limits* underscored the "fundamental principle of our democracy" that "the people should choose whom they

please to govern them" (514 U.S. at 819); that principle *supports* laws requiring electors to respect the wishes of the people of their State. Finally, while *Term Limits* holds that States may not impose qualifications for senators and representatives, *Ray v. Blair* holds that States *may* impose qualifications (such as pledge requirements) for electors. *Term Limits* thus does not advance Appellants' claims.

**b.** Appellants also assert that state faithless-elector laws render the Electoral College "superfluous." Mot. 10. That is incorrect. *First*, States today retain the power to appoint legally unbound electors, and some States do just that. Washington's refusal to exercise the option of appointing unbound electors does not make the constitutional provisions granting that choice "superfluous." *Second*, even if all States chose to bind their electors, the Electoral College provisions still would not be superfluous, since they would continue to serve important functions: ensuring that small States retain a meaningful role in presidential elections, promoting national unity by making it more difficult for candidates to win by running up the vote in small regions, and combating voter apathy by allowing voters to participate in smaller voting pools within a given state. *Finally*, a constitutional provision does not become "superfluous" merely because it requires ceremonial action. Many clauses require acts that might be considered formalities—*see, e.g.*, U.S. Const. art. I, § 5, cl. 3 (each House must keep a journal); *id.* art. II § 3 (President must commission officers)—but that does not make them superfluous.

**c.** Appellants next complain that faithless-elector laws vary from State to State. Mot. 10. The constitutional text, however, undermines Appellants' demand for uniformity at every turn. It provides that "*[e]ach State*" must appoint electors "in such manner *as the Legislature thereof* may direct." U.S. Const. art. II, § 1, cl. 2 (emphasis added). It directs electors to meet separately, "*in their respective States*." U.S. Const. amend. XII (emphasis added). Indeed, it expressly requires "the Day on which [the] Electors shall give their Votes … [to] be the same throughout the United States," thereby implying that everything else about the Electoral College does not have to be the same throughout the United States.

Precedent likewise defeats Appellants' insistence on nationwide homogeneity. *Ray v. Blair*, as discussed, holds that States may require electors to make pledges—even though pledge requirements obviously vary from State to State. Appellants never explain why the Constitution allows variety when it comes to the making of electoral pledges, but requires uniformity when it comes to the enforcement of those very same pledges.

**d.** Appellants claim last of all that their interpretation has the supposed virtue of allowing electors to set aside the democratic judgment of the people when the electors conclude that the people's choice is not "fit" or "qualified." Mem. 2. There is, however, no reason to expect that the party loyalists who serve as electors are better positioned than the voters to judge the qualifications of presidential can-

- 17 -

didates. Quite the opposite, in fact. History shows that faithless electors tend to make *worse* judgments than the electorate as a whole. In 1836, 23 Virginia electors refused to vote for vice-presidential nominee Richard Mentor Johnson because they learned of his cohabitation with a black woman. In 1960, an Oklahoma elector tried to persuade fellow electors to elect Harry Byrd, the architect of "massive resistance" to *Brown v. Board of Education*. In 1968, a North Carolina elector voted faithlessly for George Wallace, a politician notorious for promising "segregation now, segregation tomorrow, segregation forever." And in 2004, a Minnesota elector voted for John Edwards for President rather than Vice President by mistake. *See* www.fairvote.org/faithless_electors. This historical pattern inspires little confidence that electors, now and in the future, will use the enormous and unchecked power Appellants seek to put in their hands for noble purposes.

Appellants' odd electoral odyssey proves the point. The most frequently mentioned choice of the handful of "rogue" electors in Washington and elsewhere is Ohio Governor John Kasich. Yet Kasich (who has said he does not want the electors' votes) was no more a candidate during the general election than was Kanye West—meaning that these electors now seek the right to vote for *anyone* they see fit, no matter whether the individual campaigned for office or received any public scrutiny. Hardly the sort of power that should be left to 538 people most Americans have never heard of.

**B.     Appellants Cannot Show Likely Irreparable Harm**

A movant seeking preliminary relief must show that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Appellants cannot show a "likely" injury for the same reason they cannot show even an Article III injury: They have no concrete plans to violate the statute, and Washington has never credibly threatened to punish them if they do. In any event, appellants face only a civil penalty of $1,000 for voting faithlessly (Wash. Rev. Code § 29A.56.340), and a "monetary loss" does not constitute irreparable harm. *Colo. River Indian Tribes v. Parker*, 776 F.2d 846, 850 (9th Cir. 1986).

**C.     The Balance of Harms and Public Interest Disfavor an Injunction**

While denying an injunction would cause Appellants little harm, granting one would do incalculable harm to the other parties and to the country. Most importantly, an injunction would violate the constitutional rights of voters by "debas[ing]" and "dilut[ing]" their votes. *Bush*, 531 U.S. at 105. When Washington's voters listened to the candidates, reflected about their votes, and ultimately went to the polls, Washington law promised them that their ballots would bind the electors. Telling the voters now that their ballots were purely advisory would debase and dilute their votes, in violation of the Constitution.

Relatedly, an injunction would violate the associational rights of political parties. The First Amendment grants special protection to a political party's right

- 19 -

to "selec[t] a standard bearer who best represents the party's ideologies and preferences." *Eu v. San Francisco Democratic Central Comm.*, 489 U.S. 214, 224 (1989). Inducing political parties to choose electors on the understanding that electors play only a ministerial role, but pulling the rug out from under the parties after the fact, makes a parody of that special protection.

An injunction would also undermine the public interest in an orderly transition. The Presidential Transition Act declares that "[t]he national interest requires" orderly transitions. Pub. Law 88-277, § 2. For weeks, therefore, the outgoing and incoming administrations have been proceeding with the transition "upon the assumption that the election is over." *Thomas*, 262 N.Y.S. at 325. "Any disruption" of their efforts by introducing uncertainty into the process threatens to compromise "the safety and well-being of the United States and its people." § 2.

## CONCLUSION

Appellants purport to find inspiration in the words of Alexander Hamilton. Hamilton also warned, however, that it is "peculiarly desirable to afford as little opportunity as possible to tumult and disorder" in "the election of a magistrate, who was to have so important an agency in the administration of the government as the President of the United States." Federalist No. 68. Appellants' effort to introduce tumult and disorder into the election of the President should come to an end. This Court should deny Appellants' motion.

Dated: December 15, 2016       Respectfully submitted,

*/s/* Andrew Bentz

Andrew Bentz
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
Tel: (202) 879-3849
Fax: (202) 626-1700
abentz@jonesday.com

*/s/* Chad Readler

Chad Readler
*Admission application pending*
JONES DAY
325 John H. McConnell Blvd.
Suite 600
Columbus, OH 43215
careadler@jonesday.com

*Counsel for President-elect Donald J. Trump;
Donald J. Trump for President, Inc.*

*/s/* Robert A. McGuire, III

Robert A. McGuire, III
THE ROBERT MCGUIRE LAW FIRM
2703 Jahn Avenue NW, Suite C-7
Gig Harbor, WA 98335
Telephone: (253) 313-5485
Fax: (866) 352-1051

*Counsel for President-elect Donald J. Trump;
Donald J. Trump for President, Inc.*

*/s/* Robert Maguire

Robert Maguire
DAVIS WRIGHT TREMAINE
1201 Third Ave. Ste 2200

Seattle, WA 98101
(206) 622-3150
*Counsel for Washington State Republican Party*

## CERTIFICATE OF SERVICE

I certify that on December 15, I electronically filed the foregoing brief with the United States Court of Appeals for the Ninth Circuit using the ECF system. All parties have consented to receive electronic service and will be served by the ECF system.

Dated: December 15, 2016      */s/* Andrew Bentz
                                     Andrew Bentz

                                     *Counsel for Intervenor-Appellees*